## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **MELVIN BAISDEN,** | : | |
| | : | |
| **Plaintiff,** | : | **C.A. No.** |
| | : | |
| **v.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **NUCAR CONNECTION and** | : | |
| **KIA AUTO SALES CORP,** | : | |
| **Delaware Corporations** | : | |
| | : | |
| **Defendants.** | : | |

## COMPLAINT

### PARTIES

1.      Plaintiff, Melvin Baisden, (hereinafter "Plaintiff" or "Mr. Baisden"), was at all times relevant to this Complaint a resident of New Castle County, Delaware and whose current mailing address is 4172 Mistymorn Way, Powder Springs Georgia 30127.

2.      Defendant, NuCar Connection (hereinafter "NuCar"), is an entity doing business in the State of Delaware selling and servicing automobiles.  It is subject to service of process through its Registered Agent, Robert C. Lefton, at 913 North Market Street, Suite 1011, P.O. Box. 506, Wilmington, DE 19801.

3.      Defendant, Kia Auto Sales Corp. (hereinafter "Kia"), is an entity doing business in the State of Delaware selling and servicing automobiles.  It is subject to service of process through its Registered Agent, Registered Agents, Ltd., at 1220 North Market Street, Suite 804, Wilmington, DE 19801.

## JURISDICTION

4.    Jurisdiction in this Honorable Court is founded on the existence of a question arising under federal statutes. Specifically, this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq*., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 704(a) of Title VII of the Civil Rights Act and 42 U.S.C. § 1981. The jurisdiction of this Court is invoked to secure protection and redress deprivation of rights secured by federal and state law which prohibits discrimination against employees because of their race. The state whistleblower's claim is brought pursuant to the pendent jurisdiction of this Court.

## FACTUAL BACKGROUND

5.    Mr. Baisden is an African-American who began working for NuCar Connection as a salesman in or about July 2003 and thereafter was promoted to Special Finance Manager in or about December 2003.

6.    Special Finance Managers are paid a commission based upon the amount of financing that they provide for NuCar's customers.

7.    The Finance Director at NuCar, Paul Bucklin (hereinafter "Mr. Bucklin"), opposed Mr. Baisden's promotion to Special Finance Manager.

8.    Mr. Bucklin is Caucasian.

9.    In protest to Mr. Baisden's promotion, Mr. Bucklin took a weeks vacation during Mr. Baisden's first week in his new position.

10.    Training is crucial for Special Finance Managers at NuCar due to the complexity of the job and due to the fact that a Special Finance Manager must also be able to perform as Sales Managers, Finance Managers as well as Salesmen.

11.    Due to Mr. Bucklin's untimely vacation, Mr. Baisden received no job training during his first week and was left to figure out his job responsibilities, procedures and .

12.    When Mr. Bucklin returned from his vacation, he provided cursory and incomplete training of Mr. Baisden.

13.    Another Special Finance Manager, Jeff Gemmil (hereinafter "Mr. Gemmil"), was employed by NuCar at the time of Mr. Baisden's promotion.  However, Mr. Gemmil was also absent from work during Mr. Baisden's first week as a Special Finance Manager due to a back injury.

14.    It was not until Mr. Gemmil returned that Mr. Baisden received the training as a Special Finance Manager that he required.

15.    Shortly after he was promoted, Dennis Davenport, NuCar's General Sales Manager and Bob McGowan, the head of NuCar's Finance Department encouraged Mr. Baisden to come forward with any ideas that he may have to improve the functioning of the Finance Department.

16.    In this regard, Mr. Baisden noticed that NuCar was losing financing opportunities and sales of automobiles because the salesmen were not bringing their customers to the first available Finance Manager for financing.

17.    In approximately March of 2004, Mr. Baisden attended finance training in Florida with Credit Acceptance Corporation which focused on the financing of

automobiles at car dealerships. One of the things he learned there was that salesmen should seek financing from the first available finance manager instead of funneling these opportunities to a particular finance manager that the salesman favors.

18.    When he got back to NuCar after his training, Mr. Baisden recognized that NuCar could keep both the financing of automobiles as well as the actual sales of the automobiles "in house" if NuCar would implement the process of taking customers to the first available Finance Manager.

19.    Mr. Baisden set up an appointment with Dennis Davenport (hereinafter "Mr. Davenport"), NuCar's General Sales Manager, and presented his proposal.

20.    Approximately one week later, Mr. Bucklin called Mr. Baisden into his office after the dealership was closed. He angrily instructed Mr. Baisden that the Finance Department was his department and that if Mr. Baisden had any ideas for improvement that he was to give those ideas to Mr. Bucklin and not Mr. Davenport or anybody else.

21.    Mr. Baisden was confused as to why Mr. Bucklin was so upset with him regarding an issue which would generate a significant amount of income for the dealership.

22.    Mr. Baisden's proposal would generate in two respects. First by preventing customers from seeking financing through other finance companies other that NuCar. It would also prevent them from going to other dealerships to purchase cars. Mr. Baisden often saw customers go to other dealerships to purchase cars after becoming impatient waiting on the particular Finance Manager favored by the salesman.

23.    Mr. Baisden's confusion was exacerbated when he discovered that Mr. Bucklin was encouraging the salesmen to take their business to the Caucasian Finance

Managers, Mr. Bucklin and Mr. Gemmil, and discouraging them from taking their business to Mr. Baisden, the only African American Finance Manager, despite the fact that there were times when Mr. Bucklin and Mr. Gemmil were too busy to service customers and Mr. Baisden was not.

24.    Mr. Baisden was discouraged by this revelation, but because he was compensated based upon the financing that he provided, he sought to generate business from other avenues.

25.    One of these avenues was to get referrals for people who had poor credit scores from a friend of Mr. Baisden's, Monique Springer, who worked at the Kia dealership.

26.    However, once Mr. Bucklin discovered that Mr. Baisden was able to generate income for himself in this manner, NuCar prohibited Mr. Basiden from accepting the Kia referrals.  In fact, Mr. Bucklin told Mr. Baisden that it was against NuCar policy to accept referrals from any dealership outside the NuCar complex (NuCar Mazda, NuCar Chevy or NuCar Used Cars).

27.    Mr. Bucklin's statement and this alleged policy is curious in that prior to working for NuCar; Mr. Baisden was a salesman at Kia.  While there, on several occasions, he secured financing through Mr. Bucklin himself for some of these clients with poor credit.

28.    In late April or early May 2004, Mr. Baisden was informed that he was being terminated from his position of Special Finance Manager.

29.    The stated reason for termination was that things were not "working out" between Mr. Bucklin and Mr. Baisden.  There were no performance issues raised.

30.    Mr. Baisden's termination was based upon his race.

31.    Mr. Baisden was then offered a position as a salesman at one of the dealership within the NuCar complex (NuCar Mazda, NuCar Chevy or NuCar Used Cars), or he could return to his prior position at Kia as a salesman.

32.    Kia is affiliated with NuCar.

33.    Mr. Baisden elected to return to the Kia dealership as a salesman.

34.    However, going back to the Kia dealership did not resolve Mr. Baisden's problems.

35.    As a salesman, Mr. Baisden's job was to show automobiles to customers and convince them to purchase automobiles.  Once the customer agreed to purchase the automobile, the customer was sent inside the dealership to meet with the Finance Managers to negotiate and complete the deal.  In other words, Mr. Baisden had no involvement with getting customers approved for financing.

36.    Mr. Baisden was very aggressive in brining in customers to the Kia dealership.  He purchased a mailing list of potential customers in the Wilmington, DE area and sent out flyers to them to solicit their business.  This technique was very effective in bringing in potential customers.

37.    Many of these customers agreed to purchase automobiles from Mr. Baisden.  However, only three were approved by Kia's Finance Managers to purchase automobiles from the dealership.

38.    One particular example is especially telling as to why Mr. Baisden's customers were not getting approved and why he was making no sales commissions.

39.    In June 2004, Mr. Baisden brought in an individual who he knew to look at some automobiles. She agreed to purchase a $17,000 Kia. Mr. Baisden sent her inside the dealership for financing. Her financing was not approved.

40.    The individual then left the Kia dealership, went to Martin Honda and was approved for a $25,000 Honda Accord. Moreover, she received a preferred rate of 7.9% interest as well.

41.    Confused, Mr. Baisden looked at the paperwork submitted by this individual and discovered that the Finance Manager with whom she dealt, Lee Shutt, a Caucasian and close personal friend of Mr. Bucklin, had not even attempted to get this customer's financing application approved. He realized that once again, he was the victim of racial discrimination.

42.    At this point, that Mr. Baisden realized that he could not survive financially as a commissioned salesman for any of the NuCar entities if they were going to refuse to attempt to get his customers financed because he is African American. Based upon NuCar and Kia's racially-based and concerted actions to prevent him from earning a living, he was left with no choice but to terminate his employment on July 2004.

43.    After he terminated his employment, the very same customer who Kia refused to approve financing for on the $17,000 Kia went back to the Kia dealership and had her financing approved for a $31,000 Chevrolet Trail Blazer. This customer's credit situation was virtually identical at this point to when she attempted to purchase the $17,000 Kia. In addition, she was in a much worse "negative equity" position due to her purchase of the Honda Accord.

44.    The Finance Manager for this sale was Mr. Bucklin.

45.    Based on Mr. Bucklin, a Caucasian, providing financing for referrals from the Kia dealership the stated policy of not accepting financing referrals from Kia did not pertain to the Caucasian Finance Managers at NuCar and only applied to Mr. Baisden, an African American.

46.    NuCar also discriminated against its African American and Hispanic customers.

47.    Specifically, Mr. Bucklin often refused to accept personal checks from African Americans and Hispanics for down payments on vehicles and told them that their down payment must be by made in the form of cash or a certified check.

48.    However, Mr. Bucklin routinely permitted Caucasians to write personal checks for such down payments on their automobiles.  He even permitted Caucasian customers from out of state to write personal checks.

49.    Mr. Baisden knew that such conduct was illegal and communicated this to Mr. Bucklin.  In response, Mr. Bucklin reprimanded Mr. Baisden for treating African Americans and Hispanics equally by permitting them to write personal checks for down payments just as he permitted Caucasian employees.

50.    Mr. Baisden filed a timely charge of race discrimination with the Equal Employment Opportunity Commission and brings this action within ninety (90) days of the receipt of his Notice of Right to Sue.

## COUNT I
### *(Title VII - Racial Discrimination against NuCar and Kia)*

51.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 50 of this Complaint by reference as though fully set forth at length herein.

52.     The practices of Defendants NuCar and Kia as complained of above, had the effect of depriving Plaintiff of equal employment opportunities and otherwise affected his employment because of his race. The practices employed by Defendants NuCar and Kia were intentional and were done with malice and/or reckless indifference to the federally-protected rights of Plaintiff.

53.     The practices of Defendants NuCar and Kia as complained of above, caused Plaintiff to experience conscious pain and suffering and other emotional harm.

54.     As a direct and proximate result of said acts of Defendants NuCar and Kia, Plaintiff has suffered, and continues to suffer, loss of employment opportunities, loss of income, loss of other employment benefits and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment and damages to his reputation.

55.     Defendants NuCar and Kia's discrimination was willful, wanton, malicious and with reckless indifference to Plaintiff's protected civil rights. As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

## COUNT II
### *(Violation of 42 U.S.C. § 1981 against NuCar and Kia)*

56.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 55 of this Complaint by reference as though fully set forth at length herein.

57.     Defendants NuCar and Kia intentionally discriminated against Plaintiff on account of his race in violation of 42 U.S.C. § 1981 by denying him equal terms and conditions of employment.

58.     As a direct and proximate result of said acts, Plaintiff has suffered, and continues to suffer, loss of employment opportunities, loss of income, loss of other

employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment and damages to his reputation.

## COUNT III
### *(Racial Discrimination – Hostile Work Environment against NuCar)*

59.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 58 and incorporates the same as if fully set forth herein.

60.     Defendant NuCar intentionally and maliciously discriminated against Plaintiff on the basis of his race (African-American) and forced him to work in a hostile work environment when it:

    a.     subjected Plaintiff to a hostile work environment wherein his supervisor repeatedly refused to accept personal checks for down payments on vehicles from African Americans while he routinely accepted personal checks for down payments from Caucasians;

    b.     reprimanded Plaintiff for offering his customers equal rights;

    c.     encouraged salesmen to submit their financing customers to Caucasian finance managers and to avoid submitting their financing customers to Mr. Baisden, an African American; and

61.     The practices of Defendant NuCar had the effect of depriving Plaintiff of equal employment opportunities and otherwise adversely affected his employment because of his race. The practices employed by Defendant NuCar were intentional and were done with malice and/or reckless indifference to Plaintiff's civil rights.

62.     As a direct and proximate result of said acts, Plaintiff has suffered, and continues to suffer, loss of employment opportunities, loss of income, loss of other

10

employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment and damages to his reputation.

63.    The above-stated damages were not the result of any act or omission on the part of Plaintiff.

## COUNT IV
### *Wrongful Discharge in Violation of Public Policy against NuCar*

64.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 63 and incorporates the same as if fully set forth herein.

65.    Defendant NuCar's termination of Plaintiff from his position as a Special Finance Manager was based upon his race and therefore violates the public policy of anti-discrimination.

66.    The practices Defendant NuCar, as complained of above, had the effect of depriving Plaintiff of equal employment opportunities.    The practices employed by Defendant NuCar were intentional and done with malice and reckless indifference to the civil rights of Plaintiff.

67.    As a direct and proximate result of said acts, Plaintiff has suffered, and continues to suffer, loss of employment opportunities, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment and damages to his reputation.

68.    The above-stated damages were not the result of any act or omission on the part of Plaintiff.

## COUNT V
### *Constructive/Wrongful Discharge in Violation of Public Policy against Kia*

69.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 68 and incorporates the same as if fully set forth herein.

70.     Defendant Kia's discriminatory actions perpetrated against Plaintiff caused a hostile environment under which Plaintiff could not function.

71.     As a result, Plaintiff was left with no other choice but to terminate his employment with Defendant Kia.

72.     Plaintiff's termination of his employment constitutes a constructive discharge in violation of the public policy of anti-discrimination.

73.     The practices Defendant Kia, as complained of above, had the effect of depriving Plaintiff of equal employment opportunities and otherwise adversely affecting his employment.  The practices employed by Defendant NuCar were intentional and done with malice and reckless indifference to Plaintiff's Civil Rights.

74.     As a direct and proximate result of said acts, Plaintiff has suffered, and continues to suffer, loss of employment opportunities, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment and damages to his reputation.

75.     The above-stated damages were not the result of any act or omission on the part of Plaintiff.


## COUNT VI
### *(Whistle Blower Protection Against NuCar)*

76.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 75 and incorporates the same as if fully set forth herein.

77.     This cause of action arises under the Delaware Whistle Blowers Protection Act, 19 Del Code §1701 *et seq.*

78.     Defendant NuCar intentionally and maliciously reprimanded and terminated Plaintiff on the basis of his whistleblower activity of complaining about African American and Hispanic customers not receiving the same right to write personal checks for a down payments on a vehicles as Caucasian customers were routinely permitted in violation of the Delaware Whistle Blowers Protection Act, 19 Del. Code §1701 *et seq.*

79.     The practices Defendant NuCar, as complained of above, had the effect of depriving Plaintiff of equal employment opportunities and otherwise adversely affecting his employment because of his whistle blowing activities. The practices employed by Defendant NuCar were intentional and done with malice and reckless indifference to the state-protected rights of Plaintiff.

80.     As a direct and proximate result of said acts, Plaintiff has suffered, and continues to suffer, loss of employment opportunities, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment and damages to his reputation.

81.     The above-stated damages were not the result of any act or omission on the part of Plaintiff.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(a)     Issue a judgment against the Defendants and in Plaintiff's favor to provide appropriate back pay with pre-judgment interest, in amounts to be determined at trial, and

other affirmative relief necessary for damages suffered by Plaintiff and to eradicate the effects of Defendants' actions and unlawful employment practices;

      (b)    Issue a judgment against the Defendants and in Plaintiff's favor ordering Defendants to provide compensation for non-pecuniary losses, including pain, suffering, and humiliation in amounts to be determined at trial, and other affirmative relief necessary for damages suffered by Plaintiff and to eradicate the effects of Defendants' actions and unlawful employment practices;

      (c)    Issue a judgment against Defendants and in Plaintiff's favor ordering Defendants to provide compensation for past and future pecuniary losses, in amounts to be determined at trial;

      (d)    Issue a judgment against Defendants and in Plaintiff's favor ordering Defendants to pay punitive damages for its malicious and/or reckless conduct in amounts to be determined at trial;

      (e)    Issue a judgment against Defendants and in Plaintiff's favor ordering Defendants to pay the costs of reasonable attorneys' fees and expenses as provided by 42 U.S.C. § 2000e-5(f)(1) and (3); and

      (f)    Issue a judgment against Defendants and in Plaintiff's favor for damages suffered by Plaintiff as a result of Defendants' actions, including, but not limited to, back pay, front pay, benefits (both retroactively and prospectively), compensatory damages, punitive damages, attorneys' fees, the cost of this litigation, pre- and post-judgment interest and such other further relief as this Honorable Court deems just and proper.

MARGOLIS EDELSTEIN


Timothy J. Wilson, Esquire (DE #4323)
1509 Gilpin Avenue
Wilmington, DE  19806
(302) 777-4680 – telephone
(302) 777-4682 – fax
twilson@margolisedelstein.com
*Attorney for Plaintiff*

DATED:  December 8, 2006

®JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) Melvin Basiden, PLAINTIFF**

**Nucar Connection and Kia Auto Sales Corp., Delaware Corporations, DEFENDANTS**

(b)    County of Residence of First Listed Plaintiff- New Castle County

(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant- New Castle County

(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c)    Attorney's (Firm Name, Address, and Telephone Number)

Timothy J. Wilson, Esquire
Margolis Edelstein
1509 Gilpin Avenue
Wilmington, DE 19806
302 777-4680

Attorneys (If Known)

---

**II. BASIS OF JURISDICTION** (Place an "X" in Box Only)

O 1    U.S. Government
Plaintiff

X 3    Federal Question
(U.S. Government Not a Party)

O 2    U.S. Government
Defendant

O 4    Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | O 1 | Incorporated or Principal Place of Business In This State | O 4 | 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business In Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

---

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| O 120 Marine | O Airplane | O 362 Personal Injury - Med. Malpractice | O 620 Other Food & Drug | O 423 Withdrawal 28 USC 157 | O 410 Antitrust |
| O 130 Miller Act | O Airplane Product Liability | O 365 Personal Injury - Product Liability | O 625 Drug Related Seizure of Property 21 USC 881 | | O 430 Banks and Banking |
| O 140 Negotiable Instrument | O Assault, Libel & | O 368 Asbestos Personal | O 630 Liquor Laws | **PROPERTY RIGHTS** | O 450 Commerce |
| O 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Injury Product | O 640 R.R. & Truck | O 820 Copyrights | O 460 Deportation |
| O 151 Medicare Act | O Federal Employers' Liability | Liability | O 650 Airline Regs. | O 830 Patent | O 470 Racketeer Influenced and Corrupt Organizations |
| O 152 Recovery of Defaulted Student Loans (Excl. Veterans) | O 340 Marine | **PERSONAL PROPERTY** | O 660 Occupational Safety/Health | O 840 Trademark | O 480 Consumer Credit |
| | O 345 Marine Product | O 370 Other Fraud | O 690 Other | | O 810 Selective Service |
| O 153 Recovery of Overpayment of Veteran's Benefits | Liability | O 371 Truth in Lending | | **SOCIAL SECURITY** | O 850 Securities/Commodities/ Exchange |
| O 160 Stockholders' Suits | O Motor Vehicle | O 380 Other Personal Property Damage | **LABOR** | O 861 HIA (1395ff) | O 875 Customer Challenge 12 USC 3410 |
| O 190 Other Contract | O Motor Vehicle Product Liability | O 385 Property Damage Product Liability | O 710 Fair Labor Standards Act | O 862 Black Lung (923) | |
| O 195 Contract Product Liability | O Other Personal | | O 720 Labor/Mgmt. Relations | O 863 DIWC/DIWW (405(g)) | O 890 Other Statutory Actions |
| O 196 Franchise | Injury | | O 730 Labor/Mgmt.Reporting & Disclosure Act | O 864 SSID Title XVI | O 891 Agricultural Acts |
| | | | O 740 Railway Labor Act | O 865 RSI (405(g)) | O 892 Economic Stabilization Act |
| O 210 Land Condemnation | O 441 Voting | O 510 Motions to Vacate Sentence | O 790 Other Labor Litigation | **FEDERAL TAX SUITS** | O 893 Environmental Matters |
| O 220 Foreclosure | X 442 Employment | **Habeas Corpus:** | O 791 Empl. Ret. Inc. Security Act | O 870 Taxes (U.S. Plaintiff or Defendant) | O 894 Energy Allocation Act |
| O 230 Rent Lease & Ejectment | O 443 Housing/ Accommodations | O 530 General | | O 871 IRS—Third Party 26 USC 7609 | O 895 Freedom of Information Act |
| O 240 Torts to Land | O 444 Welfare | O 535 Death Penalty | | | O 900 Appeal of Fee Determination Under Equal Access to Justice |
| O 245 Tort Product Liability | O 445 Amer. w/Disabilities - Employment | O 540 Mandamus & Other | | | |
| O 290 All Other Real Property | O 446 Amer. w/Disabilities - Other | O 550 Civil Rights | | | O 950 Constitutionality of State Statutes |
| | X 440 Other Civil Rights | O 555 Prison Condition | | | |

---

**V. ORIGIN** (Place an "X" in One Box Only)

X 1 Original Proceeding
O 2 from State Court
O 3 Remanded from Appellate Court
O 4 Reinstated or Reopened
O 5 from another district (specify)
O 6 Multidistrict Litigation
O 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

42 U.S.C. § 2000e) et seq.

Brief description of cause:

Race Discrimination

**VII. REQUESTED IN COMPLAINT:**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    O Yes    O No

**VIII. RELATED CASE(S) IF ANY**    (See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE
12/08/06

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2006 DEC -8 PM 4: 22

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. ___ 0 6 - ― 7 4 9 _____

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ____2____ COPIES OF AO FORM 85.

_____12/8/06_____
(Date forms issued)

_____Henry Billrefn_____
(Signature of Party or their Representative)

_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action